IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA**

v.                                     CRIMINAL NO. 2:14-00276

**MICHAEL E. BURDETTE**

<u>UNITED STATES MEMORANDUM OF LAW REGARDING FACTUAL BASES
FOR GUILTY PLEA OF DEFENDANT MICHAEL E. BURDETTE</u>

### I.   INTRODUCTION

Defendant Michael E. Burdette has pleaded guilty to an Information which charges him with negligent discharge of a pollutant in violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A) and 1311. The charge stems from the January 2014 chemical leak that occurred in Charleston, West Virginia, at a storage-tank facility owned by Freedom Industries, Inc. ("Freedom").

At the defendant's plea hearing, the Court explained the elements of the offense, without objection. The elements are restated in this memorandum, which the United States now submits to explain the factual bases for the offense of conviction.[1] A copy of this Memorandum has been provided to defendant Burdette, through his counsel, who has advised the United States that Burdette has no objection to the Memorandum.

---

[1] Rule 11 of the Federal Rules of Criminal Procedure requires the Court to determine that there is a factual basis for a guilty plea, before the Court enters judgment on the plea. Fed. R. Crim. P. 11(b)(3).

Preliminarily, "[w]hen determining whether a sufficient factual basis exists to support a guilty plea, the question before the court is not whether a jury would, or even would be likely, to convict: it is whether there is enough evidence so that the plea has a rational basis in facts that the defendant concedes or that the government proffers as supported by credible evidence. . . . [T]here must be an admission, colloquy, proffer, or some other basis for thinking that the defendant is at least arguably guilty." United States v. Delgado-Hernandez, 420 F.3d 16, 27 (1st Cir. 2005) (internal quotations and citation omitted). The factual basis requirement is simply designed to protect a defendant by ensuring that he understands the nature of the charge and to ensure that his conduct actually falls within the charge. United States v. Mastrapa, 509 F.3d 652, 660 (4th Cir. 2007).

When determining whether there is a sufficient factual basis for a guilty plea, the Court "need not rely only on the Rule 11 plea colloquy." Id. Rather, the Court may rely on "anything that appears on the record," id., including "the prosecutor's summarization of the plea agreement and the language of the plea agreement itself, a colloquy between the defendant and the district court, and the stipulated facts before the district court." United States v. Christenson, 653 F.3d 697, 700 (8th Cir. 2011). Indeed, "the factual basis for

2

certain elements may be inferred from other facts admitted by the defendant or proffered by the government." Delgado-Hernandez, 420 F.3d at 31. In the end, the Court "need only be subjectively satisfied that there is a sufficient factual basis" for a guilty plea. United States v. Ketchum, 550 F.3d 363, 366 (4th Cir. 2008).

In the Sections below, this Memorandum (a) recites the specific facts the defendant has admitted in his Stipulation (supplemented by additional, uncontested evidence), which provide the factual bases for the guilty plea, and (b) analyzes the concepts of negligence and proximate causation in light of the admitted facts and other evidence. As explained further below, there is a sufficient factual basis to support the guilty plea by defendant Burdette to the charge in the information.

## II. Negligent Discharge of a Pollutant

The elements of the offense of conviction are: (a) that a pollutant was discharged from a point source into waters of the United States; (b) that the discharge was not authorized by a Clean Water Act permit; and (c) that a person's [the defendant's] negligence proximately caused the discharge. The factual basis for this count is as follows:

A.  Element - A pollutant was discharged from point source[s] into waters of the United States.

    Facts

3

- On January 9, 2014, a major chemical leak was discovered at an above-ground storage tank farm located on the east bank of the Elk River, on Barlow Drive in Charleston, West Virginia, within the Southern District of West Virginia. The tank farm, known as the Etowah River Terminal ("Etowah Facility"), was owned by Freedom. Burdette Stipulation of Facts, p.1 (ECF-13 at 15).

- The major chemical leak that occurred on January 9, 2014, consisted of MCHM,[2] which leaked from Tank 396 at the Etowah Facility. A significant amount of the leaked MCHM pooled around the northwest side of Tank 396. MCHM breached containment, ran down the riverbank and discharged into the Elk River at one or more discernible, confined and discrete channels or fissures. Id., p.1-2 (ECF-13 at 15-16).[3]

- After it leaked, the MCHM was a pollutant as defined in the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387. See id., p.2 (ECF-13 at 16).

- The Elk River was, and is, a navigable water of the United States. Id.; see also U. S. Army Corps of Engineers "Approved Jurisdictional Determination Form" (Exhibit 1) (indicating that the Elk River has been determined to be "waters of the U.S.," from the mouth of the river in Charleston, WV, to mile 139).[4]

---

[2] The term "MCHM" refers to the chemical 4-methylcyclohexane, as Freedom originally purchased it, as well as the substance after Freedom mixed in another chemical known as "PPH." Freedom sold MCHM to coal mining companies as a cleansing agent.

[3] The Clean Water Act defines "point source" as including "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[4] That part of the element requiring that the pollutant be discharged into "waters of the United States" derives from the definition of "discharge of a pollutant," which is defined in the Clean Water Act as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). In turn, the term "navigable waters" is further defined as "the waters of the United States." 33 U.S.C. § 1362(7). The term "waters of the United States" includes interstate waters, waters which have been or may be susceptible

4

B.   Element - The discharge was not authorized by a Clean Water Act permit.

   Facts

   - Freedom, directly and through its agent ERT, operated the Etowah Facility pursuant to a "Multi-Sector General Water Pollution Control Permit," No. WV0111457, Registration No. WVG610920, that was issued by the State of West Virginia, Department of Environmental Protection, pursuant to the National Pollutant Discharge Elimination System. (The permit will be referred to hereafter as the "NPDES Permit." A copy is attached as Exhibit 2.) Burdette Stipulation of Facts, p.3 (ECF-13 at 17).

   - The Permit, which was in effect at all relevant times, authorized Freedom to discharge storm water into navigable waters, subject to monitoring and reporting requirements for certain pollutants, but it did not allow for the discharge of MCHM into any navigable waters. Freedom did not have any permit allowing for the discharge of MCHM into the Elk River. See id.; see also DEP Nov. 17, 2009 email (Exhibit 3, labeled WVDEP-16-006680) (authorizing registration of Etowah Facility under NPDES Permit, and "subject to the monitoring requirements of Sector I-1 of the [NPDES] Permit"); NPDES Permit, p.24 & pp. 12-13 (Exhibit 2)(authorizing discharge of storm water into navigable water, subject to monitoring and reporting requirements for certain pollutants under Sector I-1, but not authorizing discharge of MCHM).[5]

C.   Element - A person's [the defendant's] negligence proximately caused the discharge.

   Facts - (All facts listed below are taken or drawn from Burdette Stipulation of Facts, pp.2-5 (ECF-13 at 16-19).

---

to use in interstate commerce, and tributaries of such waters. 33 C.F.R. § 328.3(a)(1).

[5] The NPDES Permit registration was issued to "Etowah River Terminal LLC," which at all relevant times acted on behalf of and with the intent to benefit Freedom. Burdette Stipulation of Facts, p.2 (ECF-13 at 16).

5

- Burdette began working for Freedom in approximately March 2008. He initially reported to the Plant Manager of Etowah Facility. When that Plant Manager retired in the summer of 2010, Burdette became the "Terminal Manager" and Plant Manager for the Etowah Facility, positions he held up through and after January 9, 2014. As such, he supervised the employees who operated the tank farm at the Etowah Facility.

- As Plant Manager, Burdette was responsible for, among other things, operating and maintaining the Etowah Facility in a safe manner and in compliance with applicable laws, including all environmental laws. He was also responsible for ensuring that his operators were properly trained in all aspects of their jobs, including environmental compliance, although Burdette was not required to perform the training himself.

- The NPDES Permit required Freedom to develop and maintain a Storm Water Pollution Prevention Plan ("storm-water plan"). The NPDES Permit further required that a storm-water plan (i) identify potential sources of pollution that might reasonably be expected to pollute storm water discharges from the Etowah Facility; and (ii) describe and implement "Stormwater Management Controls" that would be used to reduce pollutants and to assure compliance with the NPDES Permit terms and conditions.

- The Stormwater Management Controls that should have been implemented at the Etowah Facility, as listed in the Permit, required the following:
    - Freedom should have formed a "Pollution Prevention Committee" that would have been responsible for developing a pollution prevention plan, and assisting in its implementation, maintenance, and revision.
    - Freedom should have performed preventive maintenance on "stormwater pollution prevention devices," and inspected and tested "plant equipment and systems" to "uncover conditions that could cause breakdowns or failures resulting in discharges of pollutants to surface waters."
    - Freedom should have trained "personnel at all levels of responsibility" on the components and goals of the storm-water plan.
    - Freedom should have had spill prevention and response procedures in place.

6

- - o Freedom should have performed a site inspection annually to ensure that controls were being implemented and that a required drainage map had been updated to reflect current conditions.

- In addition, Freedom should have reviewed its stormwater pollution prevention practices annually, and made revisions to the storm-water plan as necessary.

- The dike wall and containment area were "pollution prevention devices" and "plant equipment" or "systems," the breakdown of which could result in the discharge of a pollutant to surface waters.

- Freedom also should have implemented a Groundwater Protection Plan ("groundwater plan"), which could have been combined with a storm-water plan. A groundwater plan would have required Freedom to:

  - o Comply with the law and rules of West Virginia regarding groundwater protection. Section 58-4.8 of Title 47, West Virginia Code of State Rules, required an above-ground storage tank facility such as the Etowah Facility to have "secondary containment" for the tanks that would be sufficient to hold the contents of the largest tank for 72 hours in the event of a spill.
  - o Conduct training of employees on pollution prevention.
  - o Perform quarterly site inspections to ensure "all elements and equipment of the groundwater protection programs are in place, functioning properly, and are appropriately managed."

- The dike wall and containment area of the Etowah Facility were "elements and equipment of the groundwater protection program."

- Burdette should have known that the Permit required the storm-water plan and groundwater plan, as a mere reading of the NPDES Permit would have informed him of these requirements. Moreover, there was a file labeled "Stormwater" in Burdette's office at the Etowah Facility. Burdette was aware of the file, which contained various papers related to the Permit and a "Draft" storm-water plan that had been prepared in February 2002, was never signed, and the terms of which were never implemented.

7

- Burdette was negligent in failing to know of, and familiarize himself with, all of the requirements of the Permit. Consequently, and even though he was well aware that, among other things, the dike wall was not impervious, would not function to contain liquids, and was in obvious need of repair, Burdette failed to exercise due care to ensure that Freedom developed, implemented, and maintained a storm-water plan and groundwater plan.

- As a result of Burdette's negligence (and the negligence of other responsible corporate officers and agents), Freedom did not implement effectively or at all any of the required Stormwater Management Controls listed above; and Freedom failed to comply with the requirements of a groundwater plan for the Etowah Facility, including the requirement to have sufficient secondary containment to hold the contents of the largest tank within the facility for 72 hours in the event of a spill.

- The negligence of Burdette (and others) as outlined above was a proximate cause, albeit not the only proximate cause, of the discharge of MCHM into the Elk River from the Etowah Facility on January 9, 2014.

D. Analysis of Negligence and Proximate Causation.

   *1. Negligence and the Responsible Corporate Officer.*

The standard of negligence required for conviction under the Clean Water Act is ordinary negligence. The government must prove by sufficient evidence that the defendant failed to exercise "the standard of care that a reasonably prudent person would have exercised in a similar situation." United States v. Pruett, 681 F.3d 232, 242 (5th Cir. 2012)(*per curiam*)(citation omitted); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005) ("an individual violates the CWA by failing to exercise the degree of care that someone of ordinary prudence would have

exercised in the same circumstance").

By virtue of a legal concept known as the "responsible corporate officer" doctrine, criminal liability under the Clean Water Act may extend to corporate officials who, through inaction or omission where they had a duty to act, fail to prevent violations.[6] A defendant may be found guilty of a Clean Water Act violation pursuant to the "responsible corporate officer" doctrine where "the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so." United States v. Ming Hong, 242 F.3d 528, 531 (4th Cir. 2001)(citing United States v. Park, 421 U.S. 658, 673-74 (1975)). The defendant need not "have brought the violation about through some 'wrongful action.'" Id. (citing Park, 421 U.S. at 673). Moreover, to meet the definition of a "responsible corporate officer," a corporate official or agent need not in fact exercise his authority, and the corporation need not expressly vest a duty in the official to oversee the particular activity in question. Ming Hong, 242 F.3d at 531 (citing United States v. Iverson, 162 F.3d 1015, 1025 (9th Cir. 1998)). A responsible

---

[6] The Clean Water Act defines "person" -- that is, those who may be found guilty of a violation such as illegally discharging a pollutant -- to include any "responsible corporate officer." 33 U.S.C. § 1319(c)(6).

9

corporate officer has a "positive duty to seek out and remedy violations . . . but also, and primarily, a duty to implement measures that will insure that violations will not occur." Park, 421 U.S. at 672.

In a prosecution based on the responsible corporate officer doctrine, the required mental state of the defendant is derived from the offense itself. That is, "prosecution of an intentional crime under the responsible corporate officer doctrine would require proof of intent or knowledge; prosecution of a negligent crime would require proof of negligent mental state; and prosecution of a strict liability offense would not require proof of a particular mental state." Todd S. Aagaard, A Fresh Look at the Responsible Relation Doctrine, 96 J. Crim. L. & Criminology 1245, 1265 (2006); see also Park, 421 U.S. at 673-74 (holding that in a prosecution of a responsible corporate agent under the Federal Food, Drug, and Cosmetic Act, a strict liability statute, criminal liability could rest, even in the absence of "wrongful action" by the agent, on proof of a failure to act where the agent had the responsibility and authority to take action to correct a violation); Iverson, 162 F.3d at 1022, 1025 (in prosecution for a violation of the Clean Water Act based on a *knowing* discharge of a pollutant, the district court properly instructed the jury that it had to find that the discharges violated the law and that the defendant knew that

10

pollutants were being discharged).

Thus, in this case, which involves the negligent discharge of a pollutant, the prosecution must prove that the responsible corporate officer *should have known* of the condition or conditions that proximately caused the discharge. (Actual knowledge would also suffice; however, actual knowledge would also satisfy the *mens rea* requirement for a felony violation under 33 U.S.C. § 1319(c)(2).) Here, in Burdette's case, one of the proximate causes of the discharge was Freedom's failure to develop and implement storm-water and groundwater plans for the Etowah Facility.[7] The conviction of Burdette, therefore, may be established by proof that he should have known that such plans were required for the Etowah Facility and, further, that he should have known that there were no such plans in place for the Etowah Facility.

Burdette has admitted that he was aware that the Etowah Facility's operations were subject to the NPDES Permit, Burdette Stipulation of Facts, p.3 (ECF-13 at 17), and that he should have known of the requirement for the storm-water and groundwater plans. Id., p.5 (ECF-13 at 19). He also has admitted that he was responsible for ensuring that the Etowah Facility operated in accordance with the requirements of the NPDES

---

[7] Proximate causation is discussed further below.

Permit. Id. He also was aware that there was located in his office a folder marked "Stormwater," which contained a draft of a storm-water plan that had been prepared in February 2002, the terms of which were never implemented. Id. Accordingly, based on the facts listed above and in Burdette's Stipulation of Facts, it is clear that Burdette should have known that storm-water and groundwater plans had not been developed and implemented for the Etowah Facility. Burdette's failure to ensure that such plans were developed and implemented represents negligent conduct.

    *2. Proximate Causation.*

    Burdette's negligence was a proximate cause of the discharge of MCHM into the Elk River on January 9, 2014. The term "proximate cause defies easy definition and 'must be determined largely from the facts of the particular case.'" Walker v. Griffith, 626 F. Supp. 350, 352 (W.D. Va. 1986) (applying West Virginia law, and noting that West Virginia "does not appear to embrace the notion that proximate cause means the immediate cause"). "To prove proximate cause, the government must establish that the harm was a foreseeable result of the conduct." United States v. Hanousek, 176 F.3d 1116, 1123 (9th Cir. 1999). In addition, there may be more than one proximate cause. See, e.g., 3 Fed. Jury Prac. & Instr. § 120:61 (6th ed. 2011).

Pursuant to the NPDES Permit, a storm-water plan for the Etowah Facility would have required controls to prevent pollution, including the inspection and testing of plant equipment and systems, Burdette Stipulation of Facts, p.3 (ECF-13 at 17), "to uncover conditions that could cause breakdowns or failures resulting in discharges of pollutants to surface waters." NPDES Permit (Exhibit 2) at 32. A storm-water plan also would have included a program to inspect and maintain "stormwater [sic] pollution prevention devices." Id.

Furthermore, the groundwater plan required by the NPDES Permit would have included a provision for quarterly inspections "to ensure that all elements and equipment of the groundwater protection programs are in place [and] functioning properly." Id. at 35. Above-ground storage-tank facilities such as the Etowah Facility "function[] properly" by complying with West Virginia's Code of State Rules governing groundwater protection, codified at W.Va. C.S.R § 47-58-4. One such rule mandates that, secondary containment "shall be adequately designed and constructed to contain the materials for a time sufficient to allow removal and disposal without additional contamination of groundwater, but in no case will that time be less than seventy-two (72) hours." W.Va. C.S.R. § 47-58-4.8.a (attached hereto as Exhibit 4).

13

Secondary containment at the Etowah Facility consisted of the dike wall and floor of the area within the dike wall. The dike wall and floor were "stormwater [sic] pollution prevention devices" and "plant equipment and systems," the breakdown of which could "result[] in discharges of pollutants to surface waters." NPDES Permit at 32 (Exhibit 2). On January 9, 2014, however, a quantity of MCHM leaked from Tank 396, and within a few hours, seeped through the floor of the containment area, flowed into a culvert and then into the Elk River. Thus, the secondary containment at the Etowah Facility did not work to hold the MCHM within the containment area for at least 72 hours, as required by the West Virginia Code of State Regulations.[8]

Accordingly, it is evident that Burdette's failure to ensure that Freedom complied with the NPDES Permit, including the requirement to develop and implement the plans required by the NPDES Permit, resulted in Freedom's failure to ensure that the containment area at the Etowah Facility actually worked. Ultimately, therefore, Burdette's failure to exercise his authority and fulfill his responsibility as a responsible corporate officer led inexorably to the discharge of MCHM into the Elk River on January 9, 2014. His negligence was therefore a

---

[8] The MCHM leak was first discovered by plant operators shortly after 10:30 a.m. on January 9, 2014. Officials with the West Virginia Department of Environmental Protection observed MCHM on the surface of the Elk River around noon on that day.

proximate cause of the discharge of MCHM into the Elk River from the Etowah Facility on January 9, 2014.

                                            Respectfully submitted,

                                            R. BOOTH GOODWIN II
                                            United States Attorney

                        By:
                              <u>s/Philip H. Wright</u>
                              PHILIP H. WRIGHT
                              Assistant United States Attorney
                              WV State Bar No. 7106
                              300 Virginia Street East
                              Room 4000
                              Charleston, WV  25301
                              Telephone:  304-345-2200
                              Fax:  304-347-5104
                              Email: philip.wright@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "UNITED STATES MEMORANDUM OF LAW REGARDING FACTUAL BASIS FOR GUILTY PLEA OF DEFENDANT MICHAEL E. BURDETTE" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 15th day of October 2015 to:

>Susan M. Robinson, Esq.
>Thomas Combs & Spann PLLC
>P.O. Box 3824
>Charleston, WV  25338
>Email:  Srobinson@tcspllc.com

>>s/ Philip. H. Wright____
>>Philip H. Wright
>>Assistant United States Attorney
>>WV Bar No. 7106
>>300 Virginia Street, East
>>Room 4000
>>Charleston, WV 25301
>>Telephone:  304-345-2200
>>Fax: 304-347-5104
>>Email:  philip.wright@usdoj.gov